IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | | |
|---|---|---|
| LANDER D. JOHNSON, | ) | |
| | ) | Case No.: 09 C 50254 |
| Plaintiff, | ) | |
| | ) | |
| | ) | Hon. P. Michael Mahoney |
| v. | ) | U.S. Magistrate Judge |
| | ) | |
| MICHAEL J. ASTRUE | ) | |
| Commissioner of Social Security. | ) | |
| | ) | |
| Defendant, | ) | |

## MEMORANDUM OPINION AND ORDER

### I.    Introduction

Lander D. Johnson seeks judicial review of the Social Security Administration

Commissioner's decision to deny his application for Supplemental Security Income ("SSI")

under Title XVI of the Social Security Act. *See* 42 U.S.C. § 405(g). This matter is before the

magistrate judge pursuant to the consent of both parties, filed on February 23, 2010. *See* 28

U.S.C. § 636(c); Fed. R. Civ. P. 73.

### II.    Administrative Proceedings

Claimant first filed for SSI on March 20, 2007 (Tr. 102.)  He alleges a disability onset

date of January 12, 2004.  (Tr. 102.)  His claim was denied initially and on reconsideration.  (Tr.

1, 6.)  The Administrative Law Judge ("ALJ") conducted hearings into Claimant's application

for benefits on June 24, 2009.  (Tr. 22.)  At the hearing, Claimant was represented by counsel

and testified.  (Tr. 22.)  Mr. Newman, a Vocational Expert (hereinafter referred to as "VE") was

1

also present and testified.  (Tr. 41.)  The ALJ issued a written decision denying Claimant's

application on July 24, 2009, finding that Claimant was able to perform past relevant work as a

car washer/detailer.  (Tr. 18.)  Because the Appeals Council denied Claimant's Request for

Review regarding the ALJ's decision, that decision constitutes the final decision of the

Commissioner.  (Tr. 1.)

## III.     Background

At the hearing, Claimant testified to the following:

He was 53 years old and married.  (Tr. 26, 28.)  He was six feet and one inch tall,

weighed 246 pounds, and had completed school through the tenth grade.  (Tr. 26, 36.)

Claimant's wife did the cooking, cleaning, and grocery shopping for their house.  (Tr. 38-39.)

Claimant described a work attempt from 2008 where he was employed as a security

guard for a homeless shelter maintained by the American Red Cross.  (Tr. 26-28.)  Claimant

worked the job between July 2008 and roughly December 2008, but stopped working because of

his leg problems.  (Tr. 27.)  The job required him to walk for approximately six hours and sit for

about two hours, but there were no stairs or ramps to climb.  (Tr. 28-29.)  He would get a ride

from his wife to get to the job.  (Tr. 28.)

Claimant also ran a car wash at his house in 2008 for about four or five months.  (Tr. 30.)

He and his wife did not do any of the work washing cars, and instead had people that worked for

them.  (Tr. 31.)  He explained to the ALJ a note in his activities of daily living report describing

how he would go to a local car wash to wash a few cars in order to earn cash.  (Tr. 32.)  The

activities of daily living report was taken during a May 24, 2007 phone call.  (Tr. 32.)  Claimant

explained that he needed money at that time so he would work mostly drying off cars at a car

2

wash. (Tr. 32.) When asked by the ALJ whether it would be appropriate, based on Claimant's testimony, to infer that Claimant was capable of at least some work through May 24, 2007, Claimant told the ALJ that such an inference would be incorrect based on his leg and back conditions. (Tr. 32-33.)

Claimant described pain in his back and leg from when he went through surgery or some type of medical procedure for his left leg. (Tr. 33.) He had a procedure on his left leg that involved radioactive materials going through his leg that causes his leg to swell up so that he could not stand for 5 or 10 minutes[1]. (Tr. 33.) The procedure came as a result of Claimant's heart attack or stroke. (Tr. 33.) His most recent heart attack or stroke was three to four weeks prior to the hearing, and it was the fourth one he had. (Tr. 33.) The symptoms that led Claimant to go to the hospital included dizziness, cramping in his hands, and blurred vision. (Tr. 35.) On the day he had his most recent heart attack or stroke, Claimant went to the hospital in the morning and underwent a procedure whereby the doctor injected him with something to open up the valves to his heart because they were clogging up[2]. (Tr. 34.) Claimant was not kept in the hospital overnight. (Tr. 35.)

Claimant was on blood pressure medication which he took every morning, and his dosage was increased by his doctors. (Tr. 35.) He was also taking aspirin every day to help with his heart attack symptoms. (Tr. 36.) Since he stopped working, Claimant has had to keep his leg

---

[1]Claimant refers to this procedure during his testimony as an MIA. The court presumes he was referring to an MRI, and will evaluate it as such.

[2]Claimant had not reported this incident to his attorney, and his attorney told the ALJ that he did not have medical records to substantiate the visit to Swedish American Hospital as described by Claimant.

elevated to prevent swelling. (Tr. 37.) He also took ibuprofin and water pills to address the swelling. (Tr. 37.) Claimant could not stand very long and has had to use a cane during the past four to five months. (Tr. 30, 38.) He would have to move around if he was sitting for more than five to ten minutes because of circulation issues in his leg. (Tr. 38.) His wife helps him get dressed because the pain in his leg prevents him from lifting it. (Tr. 39.)

The VE described Claimant's past work as a car washer as unskilled and light work. (Tr. 42.) He noted that where Claimant listed work detailing cars, this was unskilled but considered medium work. (Tr. 42.) His work as a laborer required lifting up to 40 to 60 pounds, and would be considered unskilled medium to heavy work. (Tr. 42.) Claimant's past work as a furniture packer and mover would be semi-skilled and heavy with an SVP of 3. (Tr. 42.) His past work as a material handler was unskilled and light based on the representation that Claimant only lifted up to ten pounds. (Tr. 42.) Claimant's work as a security guard would normally be considered semi-skilled and light with an SVP of three, but as Claimant described it the VE noted that it appears to have been only unskilled. (Tr. 42.)

The ALJ asked the VE if Claimant would be able to do the work he's performed in the past if he was considered to be able to do medium work, which he defined as:

> standing and walking at least six hours in an eight-hour day, occasional lifting and carrying up to 50 pounds, frequent lifting and carrying of 25 pounds . . . it includes all lighter exertion categories of work like light and sedentary ... [without] any postural limitations or environmental limitations, except to say the Claimant shouldn't work around excessive dust, fumes, odors or temperature extremes.

(Tr. 43.) The VE stated that Claimant would be able to perform his past work based on the ALJ hypothetical. (Tr. 43.) The ALJ then asked the VE to consider the same scenario with a limitation to only a sedentary level of work. (Tr. 43-44.) The VE stated that Claimant would be

able to perform jobs such as bench hand assembler, sorter, and general assembler. (Tr. 44.)  Each

of the jobs is considered unskilled and sedentary, and there are 103,100 total jobs in Illinois.  (Tr.

44.)  Claimant's use of a cane would eliminate his ability to perform his previous jobs of car

washer, auto detailer, laborer, security guard, and packaging that ranged between light and

medium work.  (Tr. 44.)  The use of a cane would not eliminate 30% of the bench sorter jobs.

(Tr. 45.)  If a person has to elevate his leg to waist level for at least five hours per day, that

would eliminate the possibility of work.  (Tr. 45.)  If a person could only maintain a sitting

posture for 10 to 15 minutes, that would eliminate the possibility of work at the sedentary level.

(Tr. 46.)  Generally, the VE testified, a person in unskilled jobs needs to be productive for 50

minutes out of every hour.  (Tr. 46.)  A person needing to be absent more than one day per

month would also be unable to hold competitive work.  (Tr. 47.)

## IV.    Medical Evidence

Claimant's medical record begins with notes from Crusader Clinic dating to May 11,

2005, which indicate that Claimant was working but had a rash on his feet.  (Tr. 165.)  On

August 3, 2005, November 4, 2005, and January 4, 2006 Claimant had podiatry appointments at

Crusader Clinic relating to needed care for his toe nails and calluses on his feet.  (Tr. 165.)

On August 11, 2006, Claimant appeared at Crusader Clinic for a blood pressure check

and was diagnosed as having hypertension.  (Tr. 174.)  It was reported that he was taking

Norvasc and Nexium.  (Tr. 174.)  On August 14, 2006, Claimant visited Crusader complaining

of acid reflux, nausea, vomiting, weight loss, lightheadedness, and dizziness.  (Tr. 165.)  He was

diagnosed with gastroesophageal reflux disease and hypertension, and was prescribed Nexium

and Norvasc.  (Tr. 164.)  Claimant was seen again on August 15, 2006 for foot pain and a

possible ulcer. (Tr. 164, 183.) The lesions on his feet were debrided and his toe nails were trimmed. (Tr. 183.) Claimant was diagnosed with discomfort due to hyperkeratosis, hammering of the toe, and exostosis metatarsalgia. (Tr. 183.) Claimant had a check-up regarding his hypertension at Crusader Clinic on October 4, 2006. (Tr. 174.) On October 17, 2006, Claimant had a follow-up visit regarding his foot pain. (Tr. 182.) He was diagnosed with painful porokeratosis, treated by having the lesions trimmed down on both feet, and asked to return in about nine weeks. (Tr. 182.) On October 24, 2006, Claimant visited Crusader Clinic and Nurse Practitioner Lynn Yontz indicated that he needed tighter control of his hypertension. (Tr. 161.) Claimant was prescribed hydrochlorothiazide and advised to continue with Norvasc. (Tr. 161.) Claimant presented at Crusader Clinic with a cold and trouble breathing on November 9, 2006. (Tr. 160.) He cancelled a follow-up appointment on November 20, 2006 and failed to show up for an appointment on November 25, 2006. (Tr. 160.)

Claimant had follow-up appointments at Crusader Clinic relating to his hypertension or foot care on December 13, 2006, December 19, 2006, January 16, 2007, and March 20, 2007. (Tr. 159.) At the December 19, 2006 visit Claimant reported that he had injured his foot and wanted to know if treatment was available. (Tr. 181.) He stated that he worked at a car wash. (Tr. 181.) Claimant was assessed as having an uncertain foot injury, digital deformities, plantar fat pad atrophy, and onychomycosis (fungal nail infection). (Tr. 181.) On January 16, 2007, Claimant was given ibuprofin for pain related to a plantar wort on his foot. (Tr. 172.)

On May 14, 2007, Claimant underwent a psychological evaluation with Dr. John Peggau, Psy.D. (Tr. 185.) Dr. Peggau noted that Claimant's motor activity, gait, and posture were normal, his mood was euthymic, and his affect was appropriate. (Tr. 185.) Claimant denied any

hallucinations but stated that he did hear his deceased son asking him questions about two to three times per week.  (Tr. 185.)  Claimant was kicked out of school around eleventh grade and had been to jail on four occasions.  (Tr. 185.)  Claimant reported that he had used cocaine in 2001 and cannabis six months prior to the evaluation.  (Tr. 185.)  Claimant consumed alcohol only on weekend days and smoked four to five cigarettes per day.  (Tr. 185.)  Claimant reported that he last worked in 2007 doing auto detailing, but that he quit because they were not paying him the right amount.  (Tr. 185-86.)  He had previously worked for eight years in automobile detailing but was fired after being accused of stealing something out of someone's car.  (Tr. 186.)  Claimant described a typical day as getting up and taking his medication, walking around the hallways and up and down the stairs, walking to the library.  (Tr. 186.)   Dr. Peggau's conclusion was that Claimant had a learning disability, NOS and Cannabis abuse.  (Tr. 187.)  Dr. Peggau noted that Claimant was not capable of managing his own finances because of his limited mental agility, but was able to understand, remember, sustain concentration and persist in tasks. (Tr. 187.)  Claimant was able to interact socially and adapt to work settings.  (Tr. 187.)

On July 25, 2007, Claimant underwent a medical examination by Dr. Ramchandani on behalf of the State Agency.  (Tr. 188.)  Claimant described cramping lumbar back pain that had lasted for five years and was precipitated on bending, lifting and carrying 30 pounds, sitting for one hour, standing for five minutes, or walking less than half a block.  (Tr. 188.)  Claimant also described sharp and cramping pains in the plantar aspects of both of his feet, which was worsened by weighbearing, walking and standing.  (Tr. 188.)  Claimant reported having shortness of breath and wheezing attacks once or twice a day that he treated with an inhaler, though he had never been to the emergency room for asthma.  (Tr. 188.)  Claimant said that he

had last worked five years prior the examination. (Tr. 188.) Dr. Ramchandani noted that

Claimant's past medical history was remarkable for hypertension, GERD (acid reflux disease),

and chronic bronchitis. (Tr. 188.) Claimant's physical examination was unremarkable other

than evidence of extensive calluses on both feet and evidence of hallux valgus deformity on both

big toes. (Tr. 188-89.) Dr. Ramchandani found Claimant to have osteoarthritis of the lumbar

spine, calluses on both feet, severe uncontrolled hypertension, chronic bronchitis with

tobaccoism, and a history of GERD. (Tr. 189.)

Dr. Howard Tin, Psy.D., filled out a Psychiatric Review Technique Form and Mental

Residual Functional Capacity Form ("Mental RFC") on behalf of the State Agency on August

27, 2007. (Tr. 192, 206.) The Psychiatric Review Technique indicates that Claimant has a 12.02

Organic Mental Disorder described as a Learning History, NOS, and a 12.09 Substance Abuse

Disorder described as Cannabis Abuse. (Tr. 193, 200.) Dr. Howard indicated that Claimant had

a mild restriction of activities of daily living; moderate difficulties in maintaining social

functioning; moderate difficulties in maintaining concentration, persistence, or pace, and no

episodes of decompensation. (Tr. 202.)

The Mental RFC indicated that Claimant was moderately limited in the following areas:

the ability to understand and remember detailed instructions; the ability to carry out detailed

instructions; the ability to maintain attention and concentration for extended periods; the ability

to perform activities within a schedule, maintain regular attendance, and be punctual within

customary tolerances; the ability to work in coordination with or proximity of others without

being distracted by them; the ability to interact with the general public; the ability to accept

instructions and respond appropriately to criticism from supervisors; and the ability to get along

with coworkers or peers without distracting them or exhibiting behavioral extremes. (Tr. 206-07.) Dr. Tin found that Claimant was either not significantly limited or that there was no evidence of limitation in all other areas of the Mental RFC. (Tr. 206-07.) Dr. Tin noted that Claimant cannot interact appropriately with the general public and is reported to get into fights at times, so his work tasks should be limited to those that do not require interaction with the general public. (Tr. 208.)

On August 29, 2007, Dr. George Andrews, MD, performed a Physical Residual Functional Capacity Form ("Physical RFC") on behalf of the state agency. (Tr. 217.) Dr. Andrews noted that Claimant retained the capacity to do the following: occasionally lift 50 pounds; frequently lift 25 pounds; stand and/or walk for about 6 hours in an 8-hour workday; sit (with normal breaks) for a total of about 6 hours in an 8-hour workday; and push and/or pull (including operation of hand and/or foot controls) subject only to the limitations for lifting and carrying. (Tr. 211.) Claimant was found to have no postural, manipulative, visual, or communicative limitations. (Tr. 212-14.) The only environmental limitation noted was that Claimant should avoid concentrated exposure to fumes, odors, dusts, gases, poor ventilation, etc. (Tr. 214.) Dr. Andrews commented that Claimant was able to ambulate on his own despite the conditions affecting his feet. (Tr. 217.) Dr. Andrews also found that Claimant's medical history from his treating sources does not indicate a history of back problems and that Claimant's range of motion as to his back and other joints was normal. (Tr. 217.) The notes from Dr. Andrews indicate that Claimant's lungs were clear to auscultation and that there were no abnormal breathing sounds despite the allegation of asthma. (Tr. 217.) Dr. Andrews concluded that Claimant has the ability to perform work activity within the limitations of the Physical RFC

assessment. (Tr. 217.) Dr. Towfig Arjmand, M.D., affirmed the findings of the Physical RFC on November 5, 2007. (Tr. 219.)

Claimant visited Crusader Clinic on September 3, 2008 because he believed he had a stroke a few days earlier. (Tr. 239.) Claimant described how his right arm went very weak and he had problems moving it, but he had not been to a hospital. (Tr. 239.) He also described some shortness of breath and chest pain. (Tr. 239.) He had been taking Norvasc and Accupril regularly, but had not been taking hydrochlorothiazide because the prescription ran out. (Tr. 239.) Claimant reported that the strength had returned in his arm. (Tr. 239.) The treating doctor advised him of the dangers of future strokes because he had already experienced two minor ones, and reminded Claimant of the importance of following up with doctors. (Tr. 239.) He was assessed as having hypertension, status post stroke, chest pain, and shortness of breath. (Tr. 239.) Claimant was also given an EKG and sent for a cardiology referral. (Tr. 239.)

On October 3, 2008, Claimant came to Crusader Clinic for a follow-up on some test results. (Tr. 237.) Notes of the visit indicate that Claimant had previously presented without being on any blood pressure medications. (Tr. 237.) The results of Claimant's CT scan showed evidence of an older stroke, and the Carotid Dopper test showed some stenosis. (Tr. 237.) Claimant reported that the shortness of breath, chest pain, and right arm weakness had all improved, but he complained of jaw pain related to an infection. (Tr. 237.) Claimant was diagnosed with hypertension and an infection of his jaw. (Tr. 237.) He was prescribed refills of blood pressure medications along with an antibiotic for the infection. (Tr. 237.)

Claimant presented in the emergency room at Swedish American Hospital on December 21, 2008 complaining of rectal pain. (Tr. 243.) The pain was assessed as likely being secondary

to internal hemorrhoids.  (Tr. 243.)  Claimant was discharged with appropriate medications and a Norco for the pain.  (Tr. 243.)

On January 2, 2008, Claimant returned to Crusader Clinic because of his foot pain.  (Tr. 236.)  He reported that he needed to have the condition cared for because he was working at the Red Cross.  (Tr. 236.)  Claimant was diagnosed as having pain due to hyperkeratoses, clawing of the toes, and thickened nails.  (Tr. 236.)  The treating physician trimmed down the hyperkeratoses and the nails, and Claimant reported feeling better.  (Tr. 236.)  Claimant followed-up at Crusader Clinic on January 8, 2009 to obtain refills for his medications.  (Tr. 235.)  He was also looking for information on the rest of his results from his visit with the cardiologist, but the treater was unable to obtain the information.  (Tr. 235.)  Claimant's physical examination did not reveal any notable results.  (Tr. 235.)  He was assessed as having hypertension and his prescriptions were refilled.  (Tr. 235.)

Claimant visited Crusader Clinic on March 4, 2009.  (Tr. 233.)  The notes from the visit indicate that Claimant asked for a letter for his lawyer indicating that he could not lift more than 10 pounds because he had a disability hearing.  (Tr. 233.)  Claimant also reported pain in his left shoulder that originated from a fight several months earlier.  (Tr. 233.)  Claimant's physical examination was unremarkable except for tenderness in the left shoulder.  (Tr. 233.)  The treater noted that she could not flex Claimant's left arm beyond 90 degrees, but she was not sure whether he was fighting her or not.  (Tr. 233.)  The treater was not certain whether Claimant's shoulder pain had been addressed by any other medical provider, so she advised Claimant to return to Crusader Clinic in a week for follow-up.  (Tr. 234.)

V.      Standard of Review

The court may affirm, modify, or reverse the ALJ's decision outright, or remand the proceeding for rehearing or hearing of additional evidence. 42 U.S.C. § 405(g). The ALJ's legal conclusions are reviewed de novo. *Binion v. Charter,* 108 F.3d 780, 782 (7th Cir. 1997). However, the court "may not decide the facts anew, reweigh the evidence or substitute its own judgment for that of the [ALJ]." *Id.* The duties to weigh the evidence, resolve material conflicts, make independent findings of fact, and decide the case are entrusted to the Commissioner. *Schoenfeld v. Apfel*, 237 F.3d 788, 793 (7th Cir. 2001) ("Where conflicting evidence allows reasonable minds to differ as to whether a claimant is entitled to benefits, the responsibility for that decision falls on the Commissioner."). The court may remand to the Commissioner where there is a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding. 42 U.S.C. § 405(g).

If the Commissioner's decision is supported by substantial evidence, it is conclusive and this court must affirm. 42 U.S.C. § 405(g); *see also Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). "Substantial evidence" is "evidence which a reasonable mind would accept as adequate to support a conclusion." *Binion*, 108 F.3d at 782. If the ALJ identifies supporting evidence in the record and builds a "logical bridge" from that evidence to the conclusion, the ALJ's findings are supported by substantial evidence. *Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005). However, if the ALJ's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).

**VI.   Framework for Decision**

12

"Disabled" is defined as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). A physical or mental impairment is one "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

The Commissioner proceeds through as many as five steps in determining whether a claimant is disabled. *See* 20 C.F.R. § 404.1520. The Commissioner sequentially determines the following: (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant suffers from a severe impairment; (3) whether the impairment meets or is medically equivalent to an impairment in the Commissioner's Listing of Impairments; (4) whether the claimant is capable of performing work which the claimant performed in the past; and (5) whether any other work exists in significant numbers in the national economy which accommodates the claimant's residual functional capacity and vocational factors. The court will analyze each of these factors to determine whether the Commissioner's decision was supported by substantial evidence.

## VII. Analysis

### A. Step One: Is the Claimant Currently Engaged in Substantial Gainful Activity?

At Step One, the Commissioner determines whether the claimant is currently engaged in substantial gainful activity. 20 C.F.R. § 404.1520(b). Substantial gainful activity is work that involves doing significant and productive physical or mental duties that are done, or intended to

13

be done, for pay or profit. 20 C.F.R. § 404.1510. If the claimant is engaged in substantial

gainful activity, he or she is found not disabled, regardless of medical condition, age, education,

or work experience, and the inquiry ends; if not, the inquiry proceeds to Step Two.

In this case, the ALJ noted that Claimant worked after the alleged onset date and his

application filing date, but found that the work activity was not for enough time or income to

constitute substantial gainful activity under 20 C.F.R. 416.974. The ALJ found that disposition

was more appropriate at a later sequential evaluation step, and therefore held that Claimant had

not engaged in substantial gainful activitiy since March 12, 2007. (Tr. 11.) Neither party

disputes this determination. As such, the ALJ's Step One determination is affirmed.

### B.      Step Two: Does the Claimant Suffer From a Severe Impairment?

Step Two requires a determination whether the claimant is suffering from a severe

impairment. A severe impairment is one which significantly limits the claimant's physical or

mental ability to do basic work activities. 20 C.F.R. § 404.1520(c). The claimant's age,

education, and work experience are not considered in making a Step Two severity determination.

20 C.F.R. § 404.1520(c). If the claimant suffers a severe impairment, then the inquiry moves on

to Step Three; if not, then the claimant is found to be not disabled, and the inquiry ends.

In performing the Step Two analysis in this case, the ALJ found that Claimant has the

following severe impairments: lumbar arthritis; hypertension, history of "stroke"; peripheral

vascular disease; gastroesophageal reflux disease; level I obesity; chronic bronchitis; pedal

calluses; learning disorder, not otherwise specified; and substance abuse in partial remission.

(Tr. 11.) The substantial evidence in the record supports the conclusion that Claimant had one or

more severe impairments, and the parties do not dispute this determination. Therefore, the ALJ's

14

Step Two determination is affirmed.

**C.** **Step Three: Does Claimant's Impairment Meet or Medically Equal an Impairment in the Commissioner's Listing of Impairments?**

At Step Three, the claimant's impairment is compared to those listed in 20 C.F.R. pt. 404, subpt. P, app. 1. The listings describe, for each of the body's major systems, impairments which are considered severe enough *per se* to prevent a person from doing any significant gainful activity. 20 C.F.R. § 404.1525(a). The listings streamline the decision process by identifying certain disabled claimants without need to continue the inquiry. *Bowen v. New York*, 476 U.S. 467 (1986). Accordingly, if the claimant's impairment meets or is medically equivalent to a listed impairment, then the claimant is found to be disabled and the inquiry ends; if not, the inquiry moves on to Step Four.

In performing the Step Three analysis in this case, the ALJ determined that Claimant did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. pt. 404, subpt. P, app. 1. (Tr. 14.) The ALJ found that Claimant's mental impairments do not meet or equal the criteria of listings 12.02 and 12.09. (Tr. 14.) The ALJ performed a full analysis of the "paragraph B" criteria and found that Claimant's mental impairments do not cause at least two marked limitations or one marked limitation and repeated episodes of decompensation. (Tr. 14.) Neither party challenged the ALJ's findings at Step 3, so the court will affirm the ALJ's determination.

**D.** **Step Four: Is the Claimant Capable of Performing Work Which the Claimant Performed in the Past?**

At Step Four, the Commissioner determines whether the claimant's residual functional

15

capacity ("RFC") allows the claimant to return to past relevant work. Residual functional capacity is a measure of the abilities which the claimant retains despite his or her impairment. 20 C.F.R. § 404.1545(a). The RFC assessment is based upon all of the relevant evidence, including objective medical evidence, treatment, physicians' opinions and observations, and the claimant's own statements about his limitations. *Id.* Although medical opinions bear strongly upon the determination of RFC, they are not conclusive; the determination is left to the Commissioner who must resolve any discrepancies in the evidence and base a decision upon the record as a whole. 20 C.F.R. § 404.1527(e)(2); *see Diaz v. Chater*, 55 F.3d 300, 306 n.2 (7th Cir. 1995).

When assessing the credibility of a claimant's statements about his or her symptoms, including pain, the ALJ should consider the following in addition to the objective medical evidence: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the claimant's pain or other symptoms; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication that the claimant takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the claimant receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the claimant uses or has used to relieve pain or other symptoms; and (7) any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms. Social Security Ruling 96-7p; *see* 20 C.F.R. § 404.1529(c).

Past relevant work is work previously performed by the claimant that constituted substantial gainful activity and satisfied certain durational and recency requirements. 20 C.F.R. § 404.1565(a); Soc. Sec. Rul. 82-62. If the claimant's RFC allows him to return to past relevant

work, the claimant will not be found disabled; if the claimant is not able to return to past relevant work, the inquiry proceeds to Step Five.

In performing the Step Four analysis, the ALJ determined Claimant's RFC to be the following:

> The claimant retains a maximum residual functional capacity for medium work as defined in 20 CFR 416.967(c), subject to the need for simple, unskilled work involving no public contact or extended communication. (Tr. 15.)

In making his RFC determination, the ALJ indicated that he considered all of Claimant's symptoms and the extent to which the symptoms could reasonably be accepted as consistent with the medical evidence and other evidence. (Tr. 15.) The ALJ also considered opinion evidence in accordance with the requirements of 20 CFR 416.927 and SSRs 96-2p, 96-5p, 96-6p, and 06-3p. (Tr. 15.) The ALJ found that Claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms. (Tr. 16.) The ALJ then had to consider the intensity, persistence, and limiting effects of Claimant's symptoms to determine the extent to which they limit Claimant's ability to do basic work activities. Where statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by medical evidence, a finding is made on the credibility of the statements based on a consideration of the entire record. The ALJ found Claimant's statements concerning intensity, persistence, and limiting effects of his symptoms were not credible to the extent they were inconsistent with the assessed RFC. (Tr. 16.)

Based on his RFC finding, the ALJ found that Claimant was capable of performing his past relevant work as a car washer/detailer. (Tr. 18.) Claimant argues that the ALJ ignored medical evidence and made an inadequate finding regarding Claimant's credibility. Much of the

17

medical evidence Claimant highlights actually appears to be subjective complaints from the

Claimant as recorded in the notes of his treating physicians.  As described herein, Claimant did

report to his treating physicians on a number of occasions that he had sore feet or ankles.

Claimant reported at various times that his ankles and legs would swell, that he had difficulty

walking, that he needed to elevate his legs, that he could only stand for five to ten minutes, and

that he needed to use a cane.  On at least one occasion, Claimant sought treatment for an

undetermined foot injury because he had acquired a job.  The notes from the medical providers

suggest that Claimant's conditions were successfully treated through, for example, debridement

of his lesions or calluses and trimming of the toenails.

The medical evidence also shows that Claimant was consistently found to have

hypertension, a history of strokes, and chronic bronchitis secondary to tobaccoism.  Claimant's

hypertension was treated through two to three prescription medications.  Claimant reported

experiencing shortness of breath and dizziness, though the examining physician found

Claimant's lungs to be clear without signs of shortness of breath.

The ALJ thoroughly addressed Claimant's credibility as it relates to his subjective

descriptions of symptoms.  The ALJ noted that Claimant had visited a physician's assistant at

Crusader Clinic nine days prior to the originally scheduled date of his hearing before the ALJ

seeking a letter for his attorney stating that he could not lift more than ten pounds due to a

shoulder injury caused during an altercation.  There was no mention of his foot, ankle, or leg

pain.  At the same March 4, 2009 appointment, the physician's assistant refused to issue the

letter requested by Claimant and instead attempted to address Claimant's hypertension.  The ALJ

noted that Claimant told the physician's assistant that he had not followed-up on a cardiology

18

referral.  Almost two months earlier, at a January 8, 2009 appointment, Claimant had told the

same physician's assistant that he had followed-up on the cardiology referral and had another

appointment scheduled to go over the results.  The ALJ found that the inaccurate information

given to the Crusader Clinic provider indicated a lack of reliability by Claimant.

The ALJ also noted the following in his discussion of Claimant's credibility:

- At his July 25, 2007 state agency internal medicine evaluation, Claimant for the first time described lumbar pain, cramping, and lower extremity radiation that had lasted five years;

- At the state agency evaluation, Claimant moved in a measured and hesitant fashion during testing, but exhibited no difficulty squatting or rising, getting onto or off of the examination table, or dressing and undressing;

- As described, *supra*, Claimant reported a shoulder injury sustained during a physical altercation, which tends to indicate that Claimant was not as physically limited as he subjectively described;

- Claimant described working a job as a security guard between July 2008 and December 2008 – after his alleged onset date – that caused him to walk "a whole lot";

- When questioned at his hearing about self-employed income reported in 2008, Claimant described running a car wash at his home in 2007 where he paid others to do the work;

- Claimant described to Dr. Peggau that he stopped doing auto detailing in February 2007 because his employer was not paying the right amount.  Claimant stated in his Disability Report that he stopped washing cars on March 5, 2007 because his employer ran out of money to pay workers.  During his May 24, 2007 activities of daily living interview with the State Agency, Claimant stated that he would wash a few cars for cash.  The reasons given that Claimant stopped working just prior to filing for disability were not related to his alleged symptoms;

- Claimant informed Dr. Peggau during his May 14, 2007 consultative examination that he enjoyed walking around the hallways of his house, up and down the stairs, and to the library, which is inconsistent with his statements about his ability to stand and walk;

19

- Claimant told Dr. Ramchandani on July 25, 2007 that his back pain caused him to be unable to stand for more than five minutes or walk more than one-half mile, but nearly a year later Claimant held the security job that required standing and walking;

- Claimant also told Dr. Ramchandani in July of 2007 that he had last worked at a car wash five years earlier.

The above points are supported by the substantial evidence in the record and provide ample support for the ALJ's conclusions about Claimant's credibility as it relates to his alleged symptoms. The ALJ's findings regarding a claimant's credibility should stand "as long as [there is] some support in the record." *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007). The court upholds the ALJ's credibility findings.

Aside from Claimant's subjective descriptions of his limitations, there is little objective medical evidence in the record to support his claim. The ALJ provided a detailed background of Claimant's visits with his treating physicians. The ALJ also assigned substantial weight to the opinions of non-examining state agency medical consultants by substantially adopting the findings as to Claimant's RFCs. The ALJ only modified the RFC insofar as he found that the non-exertional limitation that Claimant should not work around excessive concentrations of dust, fumes, odors, and temperature extremes was inappropriate where Claimant worked after the alleged onset date detailing cars. The ALJ was not required to articulate a function-by-function narrative of Claimant's RFC. *Knox v. Astrue*, 327 Fed. Appx. 652, 657 (7th Cir. 2009). The ALJ appropriately analyzed the objective medical evidence, Claimant's testimony and credibility, and other evidence so as to articulate his reasoning and "connect the evidence to his conclusions." *Id.* (quoting *Rice v. Barnhart*, 384 F.3d 363, 371 (7th Cir. 2007)).

Claimant had reported that he had previously washed cars for eight years, including at

times in 2007 and 2008 after Claimant's alleged onset date. The ALJ presented the VE with a hypothetical based on his RFC finding, and the VE testified that Claimant could perform his previous jobs of car detailer, an unskilled job of medium exertion, and car washer, an unskilled job of light exertion. The ALJ reasonably relied on the VE's testimony to find that Claimant is capable of performing his past relevant work as a car washer/detailer. The court finds that the ALJ created an accurate and logical bridge between the evidence in the record and his conclusions. Therefore, the ALJ's Step Four finding that Claimant has not been under a disability since March 12, 2007 is affirmed.

## VIII. Conclusion

For the forgoing reasons, Claimant's motion for summary judgment is denied, and the Commissioner's motion for summary judgment is granted.

**E N T E R:**

_____

**P. MICHAEL MAHONEY, MAGISTRATE JUDGE**
**UNITED STATES DISTRICT COURT**

**DATE**: November 18, 2011